UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X

GUY COFFMAN,                                    :     Case No.: _____
                                                :
                    Plaintiff,                  :     **COMPLAINT**
                                                :
          -against-                             :     **DEMAND FOR JURY TRIAL**
                                                :
PERCEPTRON, INC., JAY W. FREELAND,              :
C. RICHARD NEELY JR., JOHN F.                   :
BRYANT, JAMES A. RATIGAN, WILLIAM               :
C. TAYLOR, and SUJATHA KUMAR,                   :
                                                :
                    Defendants.                 :
                                                :
------------------------------------- X

Plaintiff, Guy Coffman ("Plaintiff"), by the undersigned attorneys, for this complaint against Defendants, alleges upon personal knowledge with respect to Plaintiff, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is an action brought by Plaintiff against Perceptron, Inc. ("Perceptron" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Perceptron, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9.   Plaintiff's claims arise in connection with the proposed merger (the "Proposed Transaction") of and among Perceptron, Atlas Copco North America LLC ("Atlas" or "Parent"), and Odyssey Acquisition Corp. ("Merger Sub").   Plaintiff also asserts a claim against the Individual Defendants for breaching their fiduciary duty of

candor/disclosure under state law.

2.    On or about September 27, 2020, Perceptron announced that it had entered into an agreement and plan of merger, pursuant to which Merger Sub would merge with and into Perceptron, with Perceptron surviving the merger as a direct wholly-owned subsidiary of Parent (the "Merger Agreement").   Pursuant to the terms of the Merger Agreement, Perceptron's shareholders would be entitled to receive $7.00 per share in cash for each share of Perceptron common stock they owned (the "Merger Consideration").

3.    On or about October 21, 2020, in order to convince Perceptron's public common stockholders to vote in favor of the merger, the Defendants authorized the filing of a materially incomplete and misleading Schedule 14(a) Preliminary Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC").

4.    In particular, the Proxy contains materially incomplete and misleading information concerning the background of the Proposed Transaction and the valuation analyses performed by Perceptron's financial advisors, XMS Capital Partners, LLC ("XMS" or the "Financial Advisors") regarding the Proposed Transaction.

5.    The Proposed Transaction is expected to close in the fourth quarter of 2020 and the special meeting of the Company's shareholders to vote on the Proposed Transaction is forthcoming (the "Shareholder Vote").   Therefore, it is imperative that the material information that has been omitted from the Proxy is disclosed prior to the special meeting, so Plaintiff can properly exercise corporate voting rights.

6.    For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed

Transaction unless and until the material information discussed below is disclosed to Perceptron's public common shareholders sufficiently in advance of the upcoming Shareholder Vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

<u>**JURISDICTION AND VENUE**</u>

7.      This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

8.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

9.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District.  Indeed, Perceptron's securities trade on the Nasdaq Global Market (the "Nasdaq"), which is headquartered in this District, rendering venue in this District appropriate. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

10.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Perceptron common stock.

11.     Defendant Perceptron is a Michigan corporation with its principal executive offices located at 47827 Halyard Drive, Plymouth, Michigan 48170.  The Company's common stock trades on the Nasdaq under the ticker symbol "PRCP."

12.     Defendant Jay W. Freeland ("Freeland") is, and has been at all relevant times, the Company's Interim Chief Executive Officer and the Chairman of the Board of Directors of the Company.

13.     Defendant C. Richard Neely, Jr. ("Neely") is, and has been at all relevant times, a director of the Company.

14.     Defendant John F. Bryant ("Bryant") is, and has been at all relevant times, a director of the Company.

15.     Defendant James A. Ratigan ("Ratigan") is, and has been at all relevant times, a director of the Company.

16.     Defendant William C. Taylor ("Taylor") is, and has been at all relevant times, a director of the Company.

17.     Defendant Sujatha Kumar ("Kumar") is, and has been at all relevant times, a director of the Company.

18.     The Defendants identified in paragraphs 12 through 17 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with the Company, the "Defendants."

## **SUBSTANTIVE ALLEGATIONS**

**Background of the Company and the Proposed Transaction**

19.     Perceptron is a publicly traded Michigan corporation that develops, produces, and sells a comprehensive range of automated industrial metrology (i.e., measurement) products and solutions to manufacturing organizations for dimensional gauging, dimensional inspection and 3D scanning.  Perceptron's products include 3D machine vision solutions, robot guidance, coordinate measuring machines, laser scanning, and advanced analysis software.  Global automotive and other manufacturing companies rely on Perceptron's metrology solutions to assist in managing their complex manufacturing process to improve quality, shorten product launch times, and reduce costs.  Perceptron's common stock trades on the Nasdaq under the ticker symbol "PRCP."

20.     Prior to the announcement of the Proposed Transaction, Perceptron had excellent growth prospects.

21.     For example, on June 1, 2020, just a few months before the Proposed Transaction was announced, Perceptron issued a press release entitled *Perceptron Announces Fiscal Third Quarter 2020 Results* that announced that the Company was poised for long-term growth even though it was "adversely impacted by the effects of COVID-19" in the short term, stating in part:

> "Our global operations were adversely impacted by the effects of COVID-19 during the third quarter," stated Jay Freeland, Chairman and Interim CEO of Perceptron.  "In response to shelter-in-place orders and lower customer activity resulting from the pandemic, we reduced activity at all sites and, in some cases, temporarily closed facilities. As of mid-May, we had resumed production activities at the company's principal facilities located in the United States, Europe and China and plan to resume full operational capacity as required by customer demands and as permitted by law," Freeland added.
>
> "In recent months, we took aggressive action to provide for the continued health and safety of our employees, reduce costs and enhance our liquidity position.  *In April, we secured funding under the United States SBA paycheck protection program and Germany's short-time work program, both of which positioned us to*

*retain members of our workforce during this period of disruption and provide for operational continuity.  As production resumes, we will continue to work with our customers and suppliers to provide for the safe and efficient restart of operations*," Freeland continued.

"***While several customers chose to delay orders during the fiscal third quarter, we have experienced no significant cancellations in bookings or backlog***," continued Freeland.  "During the quarter, new bookings were significantly impacted in both the Asia and Americas regions and, to a lesser extent, in Europe.  Although ***we anticipate a gradual improvement in business activity as quarantine orders are lifted***, we expect our fourth quarter financial results to be adversely impacted by the pandemic.  To that end, we have chosen to withdraw our financial guidance until such time that conditions stabilize," Freeland added.

"Importantly, given existing cash which includes borrowings under our credit facility, together with recent proceeds from government assistance programs, ***we believe Perceptron has adequate liquidity to sustain its operations during this transitional period***," continued Freeland.

22.     On July 14, 2020, a little more than a month later, Perceptron issued another press release entitled *Perceptron Receives New Order to Support Upcoming Electric Vehicle Launch*, which stated that "a global, Tier-1 automotive supplier has selected Perceptron's in-line measurement technology to measure the battery frame, compartment, and lid for an upcoming new electric vehicle launch," declaring the project "significant for our business, as it represents the first major order with this particular Tier-1 supplier, a company with more than 100 facilities worldwide" and an "important new customer win."

23.     Thus, the Proposed Transaction was negotiated and announced when Perceptron's future success was not fully reflected by its share price.  As a result, the Proposed Transaction will "compensate" the Company's stockholders with cash that fails to adequately compensate them for the intrinsic value of their shares.

24.     Despite Perceptron's intrinsic value and growth prospects, the Individual Defendants are agreeing to a merger that cashes out the Company's stockholders and deprives them the ability to partake in the Company's growth.  The Individual Defendants breached their

fiduciary duties owed to the Company's stockholders by agreeing to the Proposed Transaction for the unfair Merger Consideration and allowing the unfair and flawed sales process to unfold in the manner that it did, which will cause Plaintiff and the Class to receive an inadequate Merger Consideration.

**The Proposed Transaction**

25.     On September 28, 2020, Perceptron issued a press release announcing the merger agreement:

### Perceptron Enters into Definitive Agreement to be Acquired by Atlas Copco

September 28, 2020 07:00 ET

### *All-Cash Transaction Values Perceptron at an Equity Valuation of Approximately $68.9 million*
### *71% Premium to Equity Closing Price on September 25, 2020; 192% Premium to 2020 Low*

PLYMOUTH, Mich., Sept. 28, 2020 (GLOBE NEWSWIRE) — Perceptron, Inc. (NASDAQ: PRCP), a leading global provider of 3D automated metrology solutions and coordinate measuring machines, today announced that it has entered into a definitive agreement (or the "Agreement") to be acquired by Atlas Copco, a world-leading provider of sustainable productivity solutions headquartered in Stockholm, Sweden, for $7.00 per share. The all-cash transaction values Perceptron at an equity valuation of approximately $68.9 million.

Under the terms of the agreement, Perceptron shareholders will receive $7.00 per share in cash for each share of common stock held. This consideration represents a premium of approximately 66% to the 30-day average closing share price of $4.22 as of September 25, 2020. The Board of Directors has unanimously approved the agreement and recommends that all shareholders vote in favor of the transaction. Harbert Discovery Fund, L.P., Perceptron's largest shareholder with approximately 10.5% of the total shares outstanding, has signed a Voting and Support Agreement in favor of the proposed transaction. The transaction is expected to close during the calendar fourth quarter 2020, subject to customary closing conditions, including the receipt of shareholder and regulatory approvals.

"Since our inception nearly 40 years ago, Perceptron has grown to become a leading metrology brand, one recognized for its ability to provide advanced flexible automation and quality control solutions to a diverse mix of global customers," stated Jay Freeland, Chairman and Interim CEO of Perceptron. "Atlas Copco

recognized the long-term, unrealized value evident in our business, as reflected by a compelling cash offer at a significant premium."

"After careful consideration, our Board of Directors came to the conclusion that a sale of the Company to Atlas Copco would be the optimal outcome for all shareholders and Perceptron employees," continued Freeland. "As a respected, well-capitalized organization with global reach, Atlas Copco is an ideal fit for our company. Atlas Copco's leadership position across a broad array of industrial markets, combined with a growing presence in the machine vision space, will allow them to fully leverage our technology to the benefit of existing and new customers, all while realizing economies of scale with the potential to support growth. We are excited by the opportunities that lay ahead for our combined organizations and recommend that Perceptron shareholders vote in favor of the Agreement and the transaction."

Perceptron engaged XMS Capital Partners, LLC as its financial advisor, Dykema Gossett PLLC as its legal advisor and Vallum Advisors LLC as its financial communications advisor on this transaction.

**The Preclusive Deal Protection Devices**

26.     To the detriment of the Company's shareholders, the Individual Defendants agreed, in the Merger Agreement, to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

27.     The Merger Agreement is protected by "no-shop" provisions that prohibit, except under extremely limited circumstances, the Individual Defendants from engaging in discussions or negotiations relating to proposals regarding alternative acquisitions or business combinations.

28.     These no-shop provisions also require the Board to provide Atlas written notice of any Acquisition Proposal and further requires the Board to provide prior written notice of its intention to terminate the Merger Agreement in favor of any Superior Proposal and negotiate with Atlas following receipt of the notice, so that Atlas has the opportunity to adjust the terms and conditions of the Merger Agreement so that the Acquisition Proposal ceases to be a Superior Proposal.

29.     In addition, the Merger Agreement provides that the Company will be required to pay a termination fee of $2,100,000 with respect to any termination under the no-shop provision.

30.     Ultimately, these preclusive deal protection devices restrained and continue to restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The aggregate effect of these preclusive deal protection devices, viewed in light of the materially inadequate consideration offered for the Company's shares in the Proposed Transaction and the flawed and conflicted negotiations process, supports an inference that the Board was not acting in good faith in approving the terms of the Merger Agreement.

31.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

**The Proxy Omits Material Information**

32.     On or about October 21, 2020, in order to convince the Company's public common shareholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of the materially incomplete and misleading Proxy with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

33.     Specifically, the Proxy omits two types of material information: (i) information regarding the background of the Proposed Transaction; and (ii) financial information that renders the Financial Advisors' fairness analysis materially false, misleading, or incomplete.

**A.     The Proxy Omits Material Information Regarding the Background of the Proposed Transaction**

34.     The Proxy fails to disclose material information regarding the background of the merger that implicates the Individual Defendants' potential conflicts of interest and the possibility

that the Merger Consideration is inadequate.

35.     The Proxy states that during the relevant time period leading up to the announcement of the Proposed Transaction, Perceptron had executed "confidentiality agreements" with approximately 70 potential counterparties but fails to disclose: (i) whether the confidentiality agreements contained standstill provisions, and if so, (ii) whether the standstill provisions contained "Don't Ask, Don't Waive" ("DADW") provisions or otherwise remain in effect.

36.     Indeed, the Proxy clearly contemplates the possibility that third parties may remain subject to such standstill obligations because it expressly states that Perceptron may "release or waive any standstill obligations" upon a potential counterparty's request "to the extent necessary to permit the party referred to therein to submit an acquisition proposal to the board of directors on a confidential basis."  Proxy, 67-68.  However, if there are existing standstill obligations that are subject to DADW provisions, then Perceptron's ability to "release or waive" those obligations *upon the counterparty's request* is wholly illusory, as those third parties cannot request that Perceptron release or waive their standstill obligations without breaching the DADW provision of the standstill agreement.  *See Koehler v. Netspend Holdings, Inc.*, Civ. No. 8373-VCG, 2013 Del. Ch. LEXIS 131, at *66-72 (Del. Ch. May 21, 2013) (discussing DADW provisions with potential counterparties entered into prior to negotiation of a merger agreement and concluding that the DADW provisions should have been enjoined) (discussing *In re Complete Genomics S'holder Litig.*, C.A. No. 7888-VCL, at 14-18 (Del. Ch. Nov. 27, 2012) (TRANSCRIPT)).

37.     The Proxy also fails to disclose all relevant information regarding the potential conflict of interest between Defendant Freeland, Perceptron's Interim Chief Executive Officer and Chairman of the Board of Directors who played the Company's principal role in negotiating the material terms of the Proposed Transaction, and the "representative of an investment banking firm

10

who had a prior business relationship with Mr. Freeland" and called Defendant Freeland "to inform him that Parent may be interested in a transaction with the Company." Proxy, 33.  Any reasonable investor would be left wondering about (i) the scope of this "relationship" and whether it gave rise to a potential conflict of interest, (ii) whether and when it was disclosed to the rest of the Board, (iii) whether the Board considered the possibility that this "relationship" may have resulted in a conflicted sales process, and (iv) whether the Board considered the possibility that this "relationship" necessitated the appointment of an adequately empowered Transaction Committee that excluded Defendant Freeland.

      **B.**      **The Proxy Omits Material Financial Information that Renders the Company's Financial Advisors' Fairness Analysis Materially Misleading**

      38.      The Proxy also omits material information that renders the Financial Advisors' Fairness Analysis materially misleading.

      39.      The Proxy describes the Fairness Opinion and the various valuation analyses that the Financial Advisors performed to render its opinion but fails to provide enough information regarding the necessary data, support for conclusions, or the existence of, or basis for, the underlying assumptions that underpin the fairness opinion.  Specifically, the Proxy does not disclose enough information regarding the financial projections, inputs, and assumptions for various financial valuations.  Without this information, stockholders cannot replicate the analyses, confirm the valuations, evaluate the Financial Advisors' opinion that the Merger Consideration is fair, or accurately assess the reliability of the Fairness Opinion.  The informative value of the Fairness Opinion is not in its conclusions, but in the valuation analyses that support them.  Thus, the key inputs, which are intrinsically baked into those conclusions, must also be fairly disclosed.

      40.      The Proxy fails to disclose (i) the Stand-alone unlevered, after-tax free cash flow projections prepared by management and relied on by XMS for purposes of its *Discounted Cash*

*Flow Analysis* beginning on Page 50, as well as (ii) any underlying items that were used to derive those projections, such as: (i) General and administrative expenses, (ii) Stock-based compensation expenses, (iii) Changes in net working capital, and (iv) any other items used to derive these projections. With respect to financial projections prepared or approved by Company management, which has unique insight into the future of the Company, directors are obligated to provide complete valuation metrics to shareholders, particularly in cash-out transactions where non-GAAP metrics were used by the banker, since such metrics are not uniformly defined and shareholders are therefore unable to assess the utility and legitimacy of the actual metrics without seeing the underlying components.

41.     The Proxy also fails to disclose the financial projection extrapolations prepared by XMS and reviewed by Company management for the fiscal years ending June 30, 2026 through June 30, 2030 for purposes of the *Discounted Cash Flow Analysis* beginning on Page 50.

42.     With respect to XMS' *Selected Comparable Company Analysis* beginning on Page 48, the Proxy fails to disclose (i) the objective criteria that XMS relied upon in deeming the selected companies "relevant" to its analysis, (ii) the individual multiples for each of the selected companies, and (iii) XMS' full rationale and basis for selecting a 2021E EBITDA multiple range of 8.0x to 10.0x to value the Company, including which (if any) of the selected companies were deemed most similar to the Company.

43.     With respect to XMS' *Selected Precedent Transactions Analysis* beginning on Page 49, the Proxy fails to disclose: (i) the factors that XMS relied upon in selecting the transactions analyzed, including why the range of enterprise values that XMS selected (between $90 million and $1.3 billion) selected for transactions with implied values that far exceeded the enterprise value of the Company implied by the Proposed Transaction, (ii) the individual multiples and

enterprise values for each of the selected transactions, (iii) whether each transaction contemplated cash consideration, stock consideration, or a cash/stock mix, and (iv) XMS' full rationale and basis for selecting a range of forward EBITDA multiples of 9.0x to 11.0x to value the Company, including which (if any) of the selected precedent transactions were deemed most similar to the Proposed Transaction.

44.     With respect to XMS' *Offer Price Premia Analysis* beginning on Page 50, the Proxy fails to disclose: (i) why XMS excluded non-financial and non-real estate companies and transactions that contemplated stock consideration from its analysis, and (ii) whether XMS attempted to account for the possibility that the premium implied in certain transactions was affected by a "price bump" as a result of public speculation regarding a potential acquisition of the target company.

45.     With respect to XMS' *Discounted Cash Flow Analysis* ("DCF") beginning on Page 50, the Proxy fails to: (i) disclose the cash flow projections used in the analysis, (ii) fully disclose XMS' rationale and basis for selecting discount rate ranges of 14.0% to 16.0%, including full disclosure regarding the amount of the company risk premium and "the dangers inherent in overestimating the company-specific risk premium," *see Reis v. Hazlett Strip-Casting Corp.*, 28 A.3d 442, 475 (Del. Ch. 2011), (iii) fully disclose XMS' rationale and basis for applying a range of EBITDA exit multiples of 8.0x to 10.0x, and (iv) provide a sensitivity table that presents the derived enterprise values across the full range of discount rates and exit multiples.

46.     This information is material to the Company's shareholders, and the omission of this information renders the summary of the *Discounted Cash Flow Analysis* incomplete and misleading.  As one highly-respected law professor explained regarding these crucial inputs, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key

choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, *Fairness*

*Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount

rate, and the terminal value…"  *Id.*  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can
> markedly affect the discounted cash flow value.  For example, a change in the
> discount rate by one percent on a stream of cash flows in the billions of dollars can
> change the discounted cash flow value by tens if not hundreds of millions of
> dollars….This issue arises not only with a discounted cash flow analysis, but with
> each of the other valuation techniques.  *This dazzling variability makes it difficult
> to rely, compare, or analyze the valuations underlying a fairness opinion **unless
> full disclosure is made of the various inputs in the valuation process, the weight
> assigned for each, and the rationale underlying these choices***.  The substantial
> discretion and lack of guidelines and standards also makes the process vulnerable
> to manipulation to arrive at the "right" answer for fairness.  This raises a further
> dilemma in light of the conflicted nature of the investment banks who often provide
> these opinions.

*Id.* at 1577-78 (emphasis added).  Without the above-mentioned information, the Company's

shareholders cannot: (i) evaluate for themselves the reliability of the *Discounted Cash Flow*

*Analysis*, (ii) make a meaningful determination of whether the implied equity value ranges

properly value the Company or were the result of an unreasonable judgment by the Financial

Advisors, or (iii) make an informed decision regarding whether to vote in favor of the Proposed

Transaction.

47.     Unlike poker where a player must conceal his unexposed cards, the object of a

proxy statement is to put all one's cards on the table face-up. In this case only some of the cards

were exposed—the others were concealed. If a Proxy discloses financial projections and valuation

information, such projections and valuations must be complete, accurate, and honest.  The question

is not simply whether there is a duty to speak, but also whether there may be liability for not having

spoken enough.   With regard to future events, uncertain figures, and other so-called soft

information, a company may choose silence or speech elaborated by the factual basis as then

known—but it may not choose half-truths.  *See Campbell v. Transgenomic, et al.*, No. 18-2198 (8th Cir., March 1, 2019) (noting that "half-truths" are actionable misrepresentations under securities laws and collecting cases).   Accordingly, Defendants have disclosed some of the information related to the projections, assumptions, and inputs relied upon by Defendants' financial advisors, but have omitted crucial line items, reconciliations, and other information. Thus, Defendants' omission renders the projections and summaries disclosed in the Proxy misleadingly incomplete.

48.     In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.   Absent disclosure of the foregoing material information prior to the upcoming Shareholder Vote concerning the Proposed Transaction, Plaintiff will be unable to make an informed decision regarding whether to vote his shares in favor of the Proposed Transaction, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## **COUNT I**

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)**

49.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

50.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to

section 78l of this title."  15 U.S.C. § 78n(a)(1).

51.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

52.     The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

53.     Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction.  Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding the valuation analyses performed by the Company's Financial Advisors in support of its fairness opinion.

54.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

55.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted

information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that the Company's Financial Advisors reviewed and discussed its financial analyses with the Board, and further states that the Board considered the financial analyses provided by the Company's Financial Advisors, as well as its fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review the Company's Financial Advisors' analyses in connection with their receipt of the fairness opinions, question the Company's Financial Advisors as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

56.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

57.     The Company is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

58.     The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

59.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

60.     The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

61.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

62.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.   The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

63.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

64.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

65.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

66.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**COUNT III**

**(Against the Individual Defendants for Breach of Fiduciary Duty of Candor/Disclosure)**

67.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

68.     By virtue of their role as directors and/or officers of the Company, the Individual Defendants directly owed Plaintiff and all Company shareholders a fiduciary duty of candor/disclosure, which required them to disclose fully and fairly all material information within their control when they seek shareholder action, and to ensure that the Proxy did not omit any material information or contain any materially misleading statements.

69.     As alleged herein, the Individual Defendants breached their duty of candor/disclosure by approving or causing the materially deficient Proxy to be disseminated to Plaintiff and the Company's other public shareholders.

70.     The misrepresentations and omissions in the Proxy are material, and Plaintiff will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Where a shareholder has been denied one of the most critical rights he or she possesses—the right to a fully informed vote—the harm suffered is an individual and irreparable harm.

71.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

      B.      Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

      C.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

      D.      Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: November 12, 2020

**MONTEVERDE & ASSOCIATES PC**

   */s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel:(212) 971-1341
Fax:(212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*